Jonathan L. Israel (NJ Bar No. 039301993)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016-1314
Telephone: (212) 338-3610
Facsimile: (212) 687-2329
E-mail: jisrael@foley.com

*Attorneys for Plaintiff Capital Gurus*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CAPITAL GURUS,<br><br>Plaintiff,<br><br>*v.*<br><br>FRANK J. DIMATTINA, JR., and VITAL EQUITY, LLC,<br><br>Defendants. | Case No. ____________________<br><br>**COMPLAINT** |

Plaintiff Capital Gurus ("Capital Gurus"), by its undersigned attorneys, Foley & Lardner LLP, for its Complaint against Defendants Frank J. DiMattina, Jr. ("DiMattina"), and Vital Equity, LLC ("Vital Equity"), alleges as follows:

## NATURE OF ACTION

1. Capital Gurus brings this action for misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the New Jersey Trade Secrets Act (N.J.S.A. § 56:15-1, et seq.), and for other wrongful and tortious conduct, to halt, and to recover substantial damages caused by, Defendants' theft and misuse of Capital Gurus' confidential and trade secret client loan application data and other deceptive and illicit business practices. With unauthorized acquisition and/or use of such trade secrets, Defendants are

misleading Capital Gurus' clients and diverting business opportunities and lucrative financing deals for their own gain and to the financial and other detriment of Capital Gurus.

2. Capital Gurus seeks substantial compensatory, exemplary, and treble damages, as well as injunctive relief, to protect private and confidential financial information and to ensure these fraudulent and predatory practices does not continue in the marketplace

## PARTIES

3. Capital Gurus is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

4. On information and belief, Frank J. DiMattina Jr. resides in New York and/or Florida and is a principal and owner of Vital Equity.

5. On information and belief, Vital Equity, LLC (i) is a Florida corporation with its principal place of business in Florida, (ii) is owned and operated by DiMattina, and (iii) operates, and has employees working, in New Jersey.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically, 18 U.S.C. § 1836, and pursuant principles of supplemental jurisdiction under 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over DiMattina because, on information and belief, DiMattina has purposefully directed business and financing activities to or towards persons in New Jersey, including, without limitation, prospective borrowers, lenders, and brokers and has committed tortious and other unlawful conduct, as alleged herein, in New Jersey, including through Vital Equity, which DiMattina owns and operates with New Jersey-based co-conspirator,

Justin J. Doyle ("Doyle"). These activities and conduct were intentional, targeted, and caused injury within New Jersey.

8. This Court has personal jurisdiction over Vital Equity because, on information and belief, Vital Equity operates, and has employees located, in New Jersey, and, through its principals and owners DiMattina and Doyle, and/or through its employees, has purposefully directed business and financing activities to or towards persons in New Jersey, including, without limitation, prospective borrowers, lenders, and brokers, and/or has committed tortious and other unlawful conduct, as alleged herein, in New Jersey. These activities and conduct were intentional, targeted, and caused injury within New Jersey.

9. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, and, if otherwise applicable, pursuant to 28 U.S.C. §1391(b)(3) because one or more of Defendants is subject to this Court's jurisdiction in this action.

## FACTUAL BACKGROUND

### A. Capital Gurus' Business and Confidential Trade Secret Information

10. Capital Gurus competes in a highly competitive national market for small business financing, where speed, accuracy, and lender relationships are decisive in winning deals. The company's business model depends on its ability to compile, analyze, and present highly sensitive client financial data to carefully selected lenders in order to secure optimal funding terms. Competitors cannot easily replicate Capital Gurus' methods or results without access to this confidential client data and proprietary submission strategies.

11. The "Confidential and Trade Secret Information" includes not only borrowers' personally identifiable information ("PII"), but also Capital Gurus' proprietary deal-structuring

notes, lender scoring matrices, internal funding timelines, client qualification analyses, and curated lender preference profiles. These elements are the product of years of experience and ongoing refinement and confer a measurable advantage by enabling Capital Gurus to anticipate lender terms accurately, match clients with the most favorable funders, and close transactions more efficiently than competitors.

12. The client lead data compiled by Capital Gurus—including prospective borrower identities, contact information, funding needs, credit profiles, and lender-matching notes—is the product of substantial time, labor, and expense. Capital Gurus invests significant financial resources in targeted marketing, lead-generation campaigns, referral networks, and data-verification processes to obtain and curate these leads. Once acquired, each lead is enriched with proprietary research and maintained in secure databases that are regularly updated to reflect changes in the client's business or credit status. This curated information, which is not publicly available and is closely guarded from competitors and unauthorized third parties, represents a high-value asset for Capital Gurus because it enables more successful and profitable funding transactions than could be achieved without such investment and refinement.

13. Capital Gurus takes reasonable measures to maintain the secrecy of its Confidential and Trade Secret Information. Such measures implemented by Capital Gurus, as described below, are (a) consistent with—and in many instances exceed—industry standards for financial services companies handling sensitive PII and trade secrets, and (b) are designed to eliminate inadvertent disclosures, detect suspicious access patterns, and ensure that only authorized personnel have the ability to view or transmit client financial data.

14. Capital Gurus uses secured networks to submit its highly sensitive client information to specific authorized lending partners to obtain specific loan terms and funding offers

from said partners. When the authorized lending partners make an offer to finance the requested loan based on this information, Capital Gurus transmits the terms of those various loans to its respective clients. These communications are transmitted through Capital Gurus' secure email system. If the client is interested in and accepts an offer, the loan is funded, and Capital Gurus is paid on the transaction.

15. In this loan application process, Capital Gurus does not perform any hard credit inquiries or "hard pulls" on the client's credit file. This is a deliberate, client-protective policy, designed to safeguard the client's credit score and to maintain the confidentiality of the fact that the client is seeking financing through Capital Gurus. Because no hard credit check is conducted by Capital Gurus, and the lender partners likewise refrain from initiating such checks until later stages of underwriting with the client's express consent, there is no legitimate way for competing brokers or merchant cash advance companies to know that the client is in the market for financing through Capital Gurus. Accordingly, if a third party solicits a Capital Gurus' client during or immediately after the client's application process, purporting to know the fact that they are interested in financing as well as intimate details about their financing needs, such solicitation necessarily indicates that Capital Gurus' Confidential and Trade Secret Information has been accessed and used by the solicitor without the permission of Capital Gurus or its client.

16. Capital Gurus takes reasonable measures to protect this information from such improper access and unauthorized use. In addition to encryption and password protection, Capital Gurus employs multi-factor authentication for system access, maintains activity logs that record all access attempts, and monitors for unauthorized downloads or transfers of client files. All electronic transmissions of client applications to lenders occur through secure, access-restricted portals with transport-layer security (TLS) enabled.

17. During the onboarding process, Capital Gurus provides to every new sales representative an employee handbook, which includes a "Technology & Systems Usage Policy" that addresses confidentiality, cybersecurity, data protection, system access controls, and monitoring protocols and policies relating to client data. This policy applies to all employees, including remote employees, contractors, and anyone granted access to company systems. Employees are required to acknowledge and sign the policy upon onboarding. Capital Gurus retains the signed acknowledgments in each employee's personnel file.

18. Furthermore, all employees execute a standalone Employee Non-Disclosure Agreement (the "NDA") at the start of their employment. The NDA specifically covers confidential information, proprietary systems, trade secrets, and post-employment obligations (including a five-year confidentiality term, with trade secret protections surviving indefinitely).

19. Capital Gurus employees are not allowed to access Confidential and Trade Secret Information from their personal phones or devices. When employees access the Confidential and Trade Secret Information using a Capital Gurus-issued device, they must do so by logging into a secure Virtual Private Network (or VPN).

20. Each lender receiving Capital Gurus' loan submissions is bound by a written confidentiality agreement, which expressly limits use of application materials to evaluating the specific client transaction for which they were submitted. These agreements prohibit Capital Gurus' lending partners from copying, sharing, or re-using Capital Gurus' proprietary formats, analyses, and client data for any purpose other than the particular transaction under review.

**B. Defendants' Unauthorized Outreach to Capital Gurus' Clients**

21. Beginning in early to mid-2025, Capital Gurus began noticing a troubling and highly suspect pattern: shortly after Capital Gurus would submit financing applications for clients

to authorized funding partners, those clients began to receive unsolicited calls, emails, and texts from third-party individuals, who were not affiliated with the funding partners. On information and belief, these third parties ("Impersonators") acted at the direction of (and/or as agent) for Defendants, were armed with Capital Gurus' Confidential and Trade Secret Information, used false aliases, and purported to be acting as underwriters and lenders.

22. The Impersonators aggressively sought Capital Gurus clients' sensitive financial documents identical to those already provided to Capital Gurus, claiming the documents were necessary for loan approval.

23. The timing of these unsolicited communications was suspiciously immediate, occurring within hours of Capital Gurus' submission of the client's profile to the financial partners.

24. In their unauthorized solicitations, the Impersonators displayed detailed and intimate knowledge of document names and specific terms from Capital Gurus' clients' loan submissions to Capital Gurus' lending partners. There is no permissible or lawful explanation for them to have or use this information within the timeframe of the Impersonators' outreach to Capital Gurus' clients (the same day as—and oftentimes minutes after—submission to lenders).

25. In reporting these frustrating experiences to Capital Gurus, clients have confirmed that they have had no dealings with any broker or lender other than Capital Gurus and its authorized financial partners. Clients have also informed Capital Gurus that they are discovering unauthorized hard credit pulls, despite the fact that Capital Gurus does not do hard credit pulls.

**C. Capital Gurus Links the Unlawful Activity to DiMattina and Vital Equity**

26. As these occurrences began repeating across several Capital Gurus clients, an internal investigation ensued.

27. Capital Gurus discovered that there were other documented incidents mirroring the same fact pattern involving other Impersonators, including, e.g., a "Mike Thompson," a "Andrew Levine," and an "Alexa Rodriguez."

28. For example, on or about May 2025, in a very similar instance, a client, shortly after submitting a financial application with Capital Gurus, received a call from a person identifying himself "Mike Thompson" from "Vital." Mike Thompson requested that the client release similar financial information to him, mimicking financial lender requests. The client reported the incident to Capital Gurus, which, in turn, examined the phone number from which "Mike Thompson" had called the client. That number, (347) 401-1511, is publicly associated with DiMattina. In fact, DiMattina uses the same phone number to advertise his realtor services online. DiMattina's publicly accessible LinkedIn profile also lists him as "CEO of Vital Equity":






29. Further, Vital Equity's company filings with the Florida Secretary of State show that DiMattina and Doyle are members of Vital Equity, and that DiMattina also serves as its registered agent.

30. DiMattina and Vital Equity also have solicited other Capital Gurus clients. On or about December 18, 2025, another client received an email – with subject line, "FUNDING FOR CARMEN" – from one "Peter Schwartz," using the email address "Peter@VitalEquity.org" and representing himself as the Operating Director at Vital Equity with operations in New Jersey. This unauthorized solicitation occurred shortly after this client submitted a financial application through Capital Gurus.

31. In this email, Mr. Schwartz falsely stated that he had spoken to this client on a previous occasion and requested that the client transmit sensitive financial data, including four (4) months of bank statements, driver's licenses, tax returns, and other financial reports/invoices. The client informed Capital Gurus and emphasized that the client had only been working with Capital Gurus for financing, so no other lenders or competitors should have been aware of the client's interest in financing.

32. Shortly after this outreach, a representative of Capital Gurus called the phone number provided by Vital Equity to the client, and DiMattina answered.

33. In yet another instance, on or about March 3, 2026, another client also received an email – with the subject line "Approved up to 300,000" – from one "Jake Faber" using the email address jakefaber@vitalequity.org and representing himself to also be the Operating Director at Vital Equity with operations in New Jersey. This client also received phone calls and text messages from "Jake Faber." Moreover, this unauthorized solicitation similarly occurred shortly after this client submitted a financial application through Capital Gurus.

34. In the email, Mr. Faber also requested that the client transmit the same kind of sensitive financial data, including four (4) months of bank statements, driver's licenses, tax returns, and other financial reports/invoices.

35. In his requests, Mr. Faber even referenced the particular bank that this client used. This reference directly indicates Mr. Faber (and Vital Equity at large) somehow obtained confidential Capital Gurus client data because this client had provided financial information from this refenced bank in the client's application with Capital Gurus.

36. The client informed Capital Gurus about this incident and emphasized that the client had only been working with Capital Gurus for financing, so no other lenders or competitors should have been aware of the client's interest in financing.

37. Furthermore, this client was contacted from the phone number (732) 539-8936 by a person again identifying themselves as "Jake Faber." This number has been traced to an individual by the name of "Jake Parlacoski," a New Jersey resident in Monmouth County. The discrepancy between these two names further suggests the use of a false alias.

38. These are not the only instances of clients reporting similar solicitations immediately following Capital Gurus' submission of the clients' completed loan application documents to Capital Gurus' lending partners.

39. On information and belief, Defendants are improperly obtaining and/or accessing Capital Gurus' Confidential and Trade Secret Information without Capital Gurus' authorization, in deliberate, concerted attempts to divert Capital Gurus' clients and transactions for Defendants' own benefit and to the detriment of and harm to Capital Gurus.

40. For instance, one Capital Gurus client submitted her finance application with Capital Gurus, but upon being badgered by unrequested solicitation, this client withdrew her application from Capital Gurus' business and stated that she "could not work with [Capital Gurus]" any longer, as she believed Capital Gurus to be involved in these solicitations.

41. As a result of Defendants' wrongful conduct, Capital Gurus has lost substantial revenues, commercial opportunities, and goodwill and faces continued risk of misappropriation of its trade secrets and other proprietary and confidential information.

## CAUSES OF ACTION

### Count I – Misappropriation of Trade Secrets
### Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b)

42. Capital Gurus re-alleges and incorporates by reference all preceding paragraphs.

43. Capital Gurus' loan application files, borrower identities, financial statements, credit histories, deal terms, lender preferences, underwriting analyses, and related submission records (i.e., Confidential Trade Secret Information) constitute "trade secrets" under 18 U.S.C. § 1839(3). This data derives independent economic value from not being generally known to competitors because Capital Gurus' confidential information and proprietary processes enable it to secure loan offers that are more favorable, faster, and more tailored to client needs compared to

competitors. Capital Gurus' advantage comes from its exclusive lender relationships, unique knowledge of lender preferences, optimized methods for presenting client data, and detailed financial insights that competitors do not possess. By protecting this information, Capital Gurus preserves its ability to consistently deliver superior financing options compared to the rest of the market.

44. The Confidential and Trade Secret Information is subject to reasonable secrecy measures, including password-protected systems, encryption, access limitations, and confidentiality agreements.

45. Defendants acquired the Confidential and Trade Secret Information through improper means and used it for their own benefit and/or for affiliated merchant cash advance companies.

46. Defendants intentionally used this Confidential and Trade Secret Information to solicit Capital Gurus' clients, divert pending transactions, and submit loan details to competing funders without Capital Gurus' knowledge or consent.

47. The repeated, coordinated, and concealed nature of Defendants' acts demonstrates willfulness and malicious intent.

48. Capital Gurus has suffered substantial loss of revenue, commissions, and goodwill, entitling it to damages, exemplary damages (up to double), equitable relief, and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)–(D).

**Count II – Misappropriation of Trade Secrets,**
**New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1 et seq.**

49. Capital Gurus re-alleges and incorporates by reference all preceding paragraphs.

50. Capital Gurus' Confidential and Trade Secret Information qualifies under NJTSA's definition for the reasons stated above (*see* ¶¶ 10-20, 36-40).

51. Defendants' misappropriation, acquisition, and use of these trade secrets without consent and through improper means violates N.J.S.A. § 56:15-2, has caused harm to Capital Gurus, and has enabled Defendants to unjustly benefit from ill-gotten gains. The harm and/or unjust enrichment caused by Defendants' conduct is ongoing, imminent, and irreparable (*see*, *e.g.*, ¶¶ 33-37).

52. The conduct was willful and malicious, entitling Capital Gurus to damages, exemplary damages, and attorneys' fees under N.J.S.A. § 56:15-6, as well as to equitable relief.

**Count III – Conversion**

53. Capital Gurus re-alleges and incorporates by reference all preceding paragraphs.

54. Capital Gurus owns the proprietary Confidential and Trade Secret Information and related confidential data.

55. Capital Gurus had an immediate right to possess the Confidential and Trade Secret Information.

56. Acting maliciously and with wanton and willful disregard for Capital Gurus' rights, Defendants wrongfully interfered with Capital Gurus' right to the Confidential and Trade Secret Information by improperly and illegally exercising dominion and control over this property to the exclusion of Capital Gurus' rights.

57. For Defendants' unlawful conversion, Capital Gurus is entitled to compensatory and punitive damages.

**Count IV – Common-Law Misappropriation / Unfair Competition**

58. Capital Gurus re-alleges and incorporates by reference all preceding paragraphs.

59. Capital Gurus took reasonable measures and precautions to safeguard and maintain the confidentiality of the Confidential and Trade Secret Information's secrecy, including password-protected systems, encryption, access limitations, and confidentiality agreements.

60. Capital Gurus communicated this Confidential and Trade Secret Information to financial partners in confidence.

61. Acting maliciously and with wanton and willful disregard for Capital Gurus' rights, Defendants misappropriated Capital Gurus' Confidential and Trade Secret Information and other business information, diverting business opportunities and used the Confidential and Trade Secret Information to the Defendants' benefit and Capital Gurus' detriment.

62. This constitutes unfair competition under New Jersey common law, entitling Capital Guru to compensatory damages, punitive damages, and injunctive relief.

63. Capital Gurus is entitled to compensatory and punitive damages, and injunctive relief.

**Count IV – Tortious Interference with Contract**

64. Capital Gurus re-alleges and incorporates by reference all preceding paragraphs.

65. Capital Gurus had valid contracts with funding partners and clients.

66. Defendants knew of these contracts and contractual relationships.

67. Defendants wrongfully and intentionally induced breaches or disrupted performance of these contracts through unauthorized outreach and false pretenses.

68. For Defendant's tortious conduct, which was undertaken maliciously and with wanton and willful disregard for Capital Gurus' rights, Capital Gurus is entitled to compensatory damages, punitive damages, and injunctive relief.

**Count V – Tortious Interference with Prospective Economic Advantage**

69. Capital Gurus re-alleges and incorporates by reference all preceding paragraphs.

70. Capital Gurus had valid and reasonable business expectancies with clients and lenders.

71. Defendants knew of these expectancies because they improperly and illegally obtained Capital Gurus' Confidential and Trade Secret Information and other protected client data such as names, financial information, and business needs, which were subject to reasonable security and privacy measures as described above and were of a confidential nature.

72. Defendants intentionally interfered with these business expectancies, causing loss and harm to Capital Gurus, and unjust enrichment to Defendants.

73. There is a reasonable probability that Capital Gurus would have received the anticipated economic benefit from said advantages, but for the Defendants' actions.

74. Capital Gurus suffered damages including lost profits and goodwill as a result.

**JURY DEMAND**

75. Plaintiff demands trial by jury of all issues triable by jury.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Capital Gurus prays for relief, as follows, that:

i. Judgment be entered in Capital Gurus' favor and against Defendants DiMattina and Vital Equity;

ii. Capital Gurus be awarded actual damages, including past and future lost profits, and compensatory damages;

iii. Defendants' be enjoined from obtaining, accessing, using, or disclosing any of Capital Gurus' information;

iv. Defendants be disgorged of all benefits by which they have been unjustly enriched;

v. Capital Gurus be awarded treble damages;

vi. Capital Gurus be awarded exemplary damages;

vii. Capital Gurus be awarded pre-judgment and post-judgment interest.

viii. Capital Gurus be awarded its reasonable and necessary attorneys' fees;

ix. The Court enter injunctive relief against Defendants and in favor of Capital Gurus; and

x. Capital Gurus be awarded all other and further relief to which it may be entitled at law or equity.

DATED: March 9, 2026

Respectfully submitted,

FOLEY & LARDNER LLP

By: *<u>/s/ Jonathan L. Israel</u>*
Jonathan L. Israel
90 Park Avenue
New York, NY 10016
Tel: (212) 338-3610
Fax: (212) 687-2329
jisrael@foley.com

Taylor Appling (*pro hac forthcoming*)
1000 Louisiana Street, Suite 2000
Houston, Texas 77002-5007
Tel: (713) 276-5500
Fax: (713) 276-5555
tappling@foley.com

Mikle Jew (*pro hac forthcoming)*
11988 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 847-6700
Fax: (858) 792-6773
mjew@foley.com

*Attorneys for Plaintiff Capital Gurus*